Filed 11/13/20  P. v. Rodriguez CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILFREDO RODRIGUEZ,<br><br>    Defendant and Appellant. | B298710<br><br>(Los Angeles County<br>Super. Ct. No. KA113129) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Juan C. Dominguez, Judge.  Affirmed with directions.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, and David A. Wildman, Deputy Attorney General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Wilfredo Rodriguez appeals from the judgment entered after a jury convicted him on one count of first degree murder, three counts of attempted willful, deliberate, and premeditated murder, and one count of unlawful possession of a firearm. He contends that the trial court erroneously omitted instructions relating to self-defense, that his counsel rendered ineffective assistance by not requesting those instructions, that substantial evidence did not support findings the murder and attempted murders were deliberate and premeditated, that his counsel rendered ineffective assistance in the proceeding held under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), and that the abstract of judgment must be corrected. We agree the trial court must correct the abstract of judgment, and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Rodriguez and a Companion Confront Miguel Hernandez and Fernando Basurto in a Garage*

Frank and Miguel Hernandez were brothers and often spent time listening to music and drinking beer with their friends in a garage at an apartment complex in Rowland Heights where Frank and Miguel lived with their parents. The garage opened onto an alley, and from there a walkway led to the Hernandez family's apartment, 25 to 30 feet away. Frank and his friends had spray painted one interior wall of the garage with graffiti,

which included the name of a local tagging crew, "Young Fellas," and its initials, "Y.F."[1]

Late one night in May 2016, Miguel and his friend Fernando Basurto were standing in the garage, with their backs to the entrance, when Miguel heard an unfamiliar voice ask, "Do you bang?" Miguel turned to find that Rodriguez and Cardenas Estrellas had walked into the garage and were standing several feet inside the entrance. Miguel did not know either man. And according to his testimony at trial, he was immediately "a little scared," because Rodriguez had reached inside his zip-up hoodie and pulled out a pistol.

According to Miguel's trial testimony, Estrellas then repeated the question, "Do you bang?" Miguel understood Estrellas to be asking him and Basurto whether they were members of a gang, and both Miguel and Basurto said no. Estrellas then asked Miguel and Basurto "where they were from," which again Miguel understood to mean whether they were from a gang, and again he and Basurto said they were not in a gang. Estrellas then said to Miguel, "Don't rank it," which Miguel understood to mean "don't be scared." Miguel answered that he was "not ranking it" and that he "wasn't from anywhere." Miguel testified at trial, however, that he was in fact scared because throughout this conversation Rodriguez continued to hold the pistol outside his hoodie, near his stomach, angled downward,

---

[1] A tagging crew, according to a gang expert who testified at trial, is a group whose "main purpose is to graffiti, to basically get their name out there." (See *In re Angel R.* (2008) 163 Cal.App.4th 905, 912, fn. 6 ["Tagging is the term for marking walls and surfaces with graffiti. A tagging crew is a group of taggers formed for the specific purpose of marking surfaces with identifying letters, names or logos."].)

while he looked at Miguel and Basurto. Miguel testified he could tell from the sound of Basurto's voice that he, too, was scared.

Estrellas said he was from "Dub-I.D.," a Rowland Heights gang with which Miguel was familiar, sometimes also referred to as "W.I.D.," an initialism for "Wicked Insane Diablos."[2] Both Estrellas and Rodriguez gave their "nicknames." Estrellas continued to talk to Miguel and Basurto, at one point asking whether they were in "Y.F." Though Miguel was familiar with the group, neither he nor Basurto was a member, and they said so. Estrellas pulled out a spray paint can and asked Miguel if he could spray paint on the wall of the garage. His manner in asking was "aggressive," which Miguel understood "as a statement that he was going to do it." Miguel did not want him to do it, but because he was afraid to say no, he told him to "go ahead if [he] wanted to." During this seven- or eight-minute conversation, Estrellas and Rodriguez remained standing just inside the garage's entrance. Miguel could not leave the garage without bumping into them, and he was afraid that if he tried to leave, Rodriguez might shoot him.

B. *Frank Hernandez and Carlos Cardenas Arrive*

At this point Miguel's brother Frank came down the walkway from their family's apartment, drinking a beer. On reaching the garage, he saw Rodriguez and Estrellas, neither of whom he knew, standing in the entrance. As the two men turned to face him, Frank knew something was "wrong," as he testified

---

[2] "An initialism is a set of initials pronounced separately, and an acronym is a set of initials pronounced as a word." (Condlin, *Online Dispute Resolution: Stinky, Repugnant, or Drab* (2017) 18 Cardozo J. Conflict Resol. 717, 717, fn. 1.)

at trial, because Rodriguez was holding a semi-automatic, nine-millimeter Glock pistol at his waist, pointed downward. Rodriguez and Estrellas stepped toward Frank, and Estrellas asked him whether he was in a gang. Frank said he was not. Estrellas asked him whether he was in "Y.F." Frank said he was not. Estrellas tried to grab Frank's arm and told him to "get inside the garage" because he "needed to talk to" Frank. Frank did not want to enter the garage because he felt Rodriguez and Estrellas "were trying to trap us inside," but he complied out of fear that, if he did not do as he was told, Rodriguez might shoot him, Miguel, and Basurto.

After Frank joined Miguel and Basurto inside the garage, Estrellas continued to ask the three of them whether they were in Y.F., a question Frank understood was not "friendly." Frank, Miguel, and Basurto continued to tell Estrellas they were not in Y.F. When Rodriguez and Estrellas again said they were from "W.I.D.," Frank tried to "calm the situation" by telling them he knew some people in the gang. Estrellas said he "didn't care." Frank was now "scared" Rodriguez was going to shoot him, Miguel, and Basurto.

At this point Carlos Cardenas, a friend of the Hernandez family, came down the walkway from the apartment. As he neared the entrance to the garage, he saw Rodriguez and Estrellas standing inside. He assumed they were friends of Frank and Miguel whom he had not met. Rodriguez and Estrellas noticed Cardenas and "rushed up to" him. Cardenas testified at trial that Rodriguez, keeping one hand behind his back, shook hands with him, said he and Estrellas were "looking for people from Y.F.," and asked if Cardenas was "from Y.F." Rodriguez also said he was from W.I.D., gave his "gang name,"

and asked Cardenas where he was "from."  Cardenas said he was "not from nowhere," meaning he was not in "a gang or a crew or anything like that."

C.    *The Shooting Starts*

As Rodriguez was talking to Cardenas, Miguel bumped into Frank, causing him to spill his beer on Estrellas's shoes.  Estrellas said, "You spilled beer on my fucking shoes."  This "scared" Frank, who "felt the situation was escalating."  At that point he also saw and heard Rodriguez, who was still talking to Cardenas, work the slide of the pistol to "rack[ ] a round" into the chamber.  Noticing a wooden baseball bat leaned against a nearby pillar, Frank quietly gestured Miguel aside, picked up the bat, and swung it at Rodriguez's head.  Frank testified he did this because he was afraid Rodriguez was about to shoot "all of us" and he wanted "to disarm him."

After Frank struck him in the head, Rodriguez stumbled several steps away from the garage, but held onto the gun.  Frank followed him and, seeing "he wasn't disarmed," swung again, this time hitting Rodriguez in the back.  Still Rodriguez held onto the gun, and as Frank advanced to hit him again with the bat, Rodriguez pointed the gun at Frank's face and fired.  Frank, who was about five feet from Rodriguez when he fired, dropped to the ground, avoiding the shot, and ran halfway up the walkway toward the apartment.

Rodriguez entered the garage, firing at least four or five more shots.  Miguel, who had begun to fight with Estrellas, believed Rodriguez was shooting at him, and he pulled Estrellas close to use him as a shield, and then ducked behind a parked car.  Miguel testified at trial that "there was a pause with each

gunshot," that the gunfire "wasn't rapid," and that at one point he saw Basurto, who was standing two or three feet from him, "drop," though he did not know whether Basurto had been shot or was trying to avoid getting shot. After these initial shots, Miguel left the garage and ran down the alley. As he ran away, Miguel saw Rodriguez point the gun at him, and Miguel covered his head with his hands and "just ran," hearing at least two more shots as he fled. Frank also saw Rodriguez firing at Miguel as Miguel ran.

None of the shots hit Miguel, and a short distance away he hid behind a dumpster. He heard someone run along the alley toward him and continue running past him, toward the street at the end of the alley. Miguel ran back to an area near his apartment, where he met Frank and said he thought Basurto had been shot. Miguel and Frank entered the garage and found Basurto, lying on the ground, bleeding from a wound in the back of his head. His eyes were "opening and closing," but he was not responsive. Miguel and Frank hugged him and told him they loved him.

At trial Cardenas testified he saw Rodriguez aim and fire the first shot at Frank, and then saw Rodriguez continue firing the gun while "sort of moving it around, going to all of us." At one point he saw Rodriguez aim the gun at him as he fired, and stucco from the garage wall hit Cardenas in the face, but none of the bullets hit him. As Rodriguez was pointing the gun at Miguel, Cardenas turned and ran along the walkway to the apartment. Once inside, he told Vanessa Hernandez, Frank and Miguel's adult sister, to call 911, and then returned to the garage to look for Frank and Miguel.

Vanessa had been lying awake in bed, less than 30 feet from the garage, when she heard gunshots from the alley. She estimated there were initially four shots, followed by "a little bit of space, a few seconds, and then a few more" shots. Between those two sets of shots, she heard Basurto yell in a "scared" voice, "I ain't got nothing to do with this, man!" After Cardenas came in, Vanessa called 911, and while she was talking to the 911 emergency operator, Miguel came into the apartment and provided further details of the shooting, including that Basurto was shot.

Cardenas, meanwhile, had returned to the garage, where he found Basurto lying dead. An autopsy revealed Basurto was shot in the back of the neck, with the bullet passing through the base of his skull and exiting his face. The medical examiner concluded to a certainty that he was shot from behind. He also concluded that death was almost instantaneous and that Basurto could not have spoken after the bullet struck him.

D. *A Jury Convicts Rodriguez of Murder, Attempted Murder, and Unlawful Possession of a Firearm*

The People charged Rodriguez with one count of murder (Pen. Code, § 187, subd. (a); count 1),[3] three counts of attempted willful, deliberate, and premeditated murder (§§ 664, subd. (a), 187, subd. (a); counts 2, 3, 4), and one count of unlawful possession of a firearm (§ 29820, subd. (b); count 5).[4] On counts 1 through 4, the People alleged that, within the meaning of section

_____

[3]     Statutory references are to the Penal Code.

[4]     Estrellas was tried with Rodriguez, but is not a party to this appeal.

12022.53, subdivisions (b), (c), and (d), Rodriguez personally and intentionally used and discharged a firearm causing death and, within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1), a principal personally and intentionally used and discharged a firearm causing death. On all counts, the People alleged Rodriguez committed the offense for the benefit of, at the direction of, or in association with a criminal street gang, with the intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subds. (b)(1)(C), (b)(1)(A), (b)(5).)

Miguel, Frank, Cardenas, Vanessa, and the People's gang expert, among others, testified at trial. The gang expert testified about the history, structure, rivals, and criminal activity of W.I.D. He explained that in May 2016 W.I.D. claimed territory that included Rowland Heights and that, although a tagging crew operating in that territory did not pose a threat to the gang, W.I.D. "would probably hit them up to tax them," i.e., "get money from them," and would not "allow them freely to go and just tag in the area." He also testified "there is basically no right answer," i.e., no answer that would not "lead to violence," when a gang member asks, "Where are you from?" The gang expert further testified to the importance of "respect," or being "feared" as a "violent person," among gang members and the need for a gang member to "retaliate" against someone who engages him in a fight if the gang member does not want to lose his "standing" in the gang. Given a hypothetical mirroring the circumstances of the shooting here, the expert opined the shooter and his accomplice acted for the benefit of or in association with W.I.D.

Rodriguez's defense, as presented in his counsel's opening statement and closing argument, was that he was justified in producing and firing the pistol to defend himself against a lethal

and entirely unprovoked attack by Frank. Citing inconsistent accounts the Hernandez brothers and Cardenas gave police during the investigation of the incident, which included initially failing to mention Frank had attacked Rodriguez with a baseball bat and giving conflicting statements about when they first saw the gun in Rodriguez's hand, counsel for Rodriguez sought to impeach the trial testimony of Frank, Miguel, and Cardenas about, in particular, the "tone," "environment," and "mood" in the garage prior to Frank's arrival and subsequent attack with the bat. Specifically, counsel for Rodriguez sought to persuade the jury that Rodriguez was not holding the gun outside his hoodie from the beginning of the encounter, but instead pulled it out only after Frank attacked him with the bat; that "things were calm," "[n]obody was threatened," and "[t]hey were talking about the graffiti on the garage until Frankie comes down"; and that "all of a sudden" Frank, "a hothead" who was "already angry" for unrelated reasons "before the defendants even come up," "out of anger and out of bravado and maybe feeling, hey, who are these guys in my garage asking to tag on my wall? F-them. Bam. And he hits them. And my client returns, and one of their friends dies."

The jury convicted Rodriguez on all counts, found the murder of Basurto was in the first degree, and found true all firearm and gang allegations. The court sentenced Rodriguez to a prison term of 95 years to life as follows: on count 1, 25 years to life, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d); on each of counts 2, 3, and 4, 15 years to life; and on count 5, the middle term of two years, plus the middle term of three years for the gang enhancement under

10

section 186.22, subdivision (b)(1)(A), to run concurrently with the other terms.[5]  Rodriguez timely appealed.

## DISCUSSION

A.  *The Trial Court Did Not Err in Omitting Escalation Instructions on Self-Defense, and Counsel for Rodriguez Did Not Provide Ineffective Assistance by Not Requesting Them*

Instructing on Rodriguez's right to self-defense, the trial court gave CALCRIM No. 3471, "Right to Self-Defense: Initial Aggressor": "A person who starts a fight has a right to self-defense only if:  [¶] 1) He actually and in good faith tried to stop fighting; AND  [¶] 2) He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting. [¶] If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight."  The court also instructed the jury with CALCRIM No. 3472, "Right to

_____

[5]     The court did not impose a gang enhancement on the other counts, stating "the 186.22(b)(1)(C) allegation also found to be true, the court does not impose this term pursuant to *People v. Lopez* [(2005)] 34 Cal.4th 1002.  This was error.  In *Lopez* the Supreme Court held that first degree murder committed for the benefit of a gang is subject to the 15-year minimum parole eligibility term in section 186.22, subdivision (b)(5), rather than the 10-year enhancement in section 186.22, subdivision (b)(1)(C). (*Lopez*, at pp. 1006-1007; see *People v. Elizalde* (2015) 61 Cal.4th 523, 539, fn. 10; *People v. Cerda* (2020) 45 Cal.App.5th 1, 14, fn. 9, review granted May 13, 2020, S260915; *People v. Francis* (2017) 16 Cal.App.5th 876, 886.)  The court should have imposed the 15-year minimum parole eligibility term.

11

Self-Defense: May Not Be Contrived": "A person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force."[6] Rodriguez concedes he did not object or request modifications to these instructions.

Nevertheless, Rodriguez contends the trial court erred in omitting "the sudden escalation portion" of CALCRIM No. 3471, which states: "[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]" He also contends the trial court erred in not modifying CALCRIM No. 3472 to include a statement that "a person who provokes a fight or quarrel with an intent to use nondeadly force regains the right to self-defense if his opponent counters with deadly force." Rodriguez further contends that, "to the extent an objection or affirmative request to modify any of the challenged instructions was required," we should resolve the issue "on its merits because under those circumstances appellant received the ineffective assistance of counsel." The trial court did not err, however, and counsel for Rodriguez did not render ineffective assistance.

---

[6] The trial court also instructed on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on a heat of passion theory and voluntary manslaughter and attempted voluntary manslaughter based on imperfect self-defense.

12

1. *The Trial Court Had No Duty To Instruct on an Escalation Theory*

"'"It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence"' and "'necessary for the jury's understanding of the case.'" [Citations.] It is also well settled that this duty to instruct extends to defenses 'if it appears . . . the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 73; see *People v. Jennings* (2019) 42 Cal.App.5th 664, 676-677 ["'a trial court's duty to instruct, sua sponte, . . . on particular defenses is more limited [than its duty to instruct on lesser included offenses], arising "only if it appears that the defendant is relying on such a defense, or *if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case*"'"].) "We review de novo a claim that the trial court failed to properly instruct the jury on the applicable principles of law." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 850; accord, *People v. Dearborne* (2019) 34 Cal.App.5th 250, 260.)

Rodriguez suggests the version of CALCRIM No. 3471 the trial court gave was incomplete because it did not include the principle that, when an initial aggressor uses "non-deadly force and his opponent suddenly escalates the conflict with the use of deadly force such that the defendant has no time to withdraw, the defendant may defend himself or herself using deadly force without first satisfying the withdrawal requirements set forth in CALCRIM No. 3471." (See *People v. Salazar* (2016) 63 Cal.4th 214, 249 (*Salazar*) ["'"where [a] counter assault is so sudden and

13

perilous that no opportunity be given to decline further to fight and [the defendant] cannot retreat with safety he is justified in slaying in self-defense""']; *People v. Quach* (2004) 116 Cal.App.4th 294, 301 ["'Where the original aggressor is not guilty of a deadly attack, but of a simple assault or trespass, the victim has no right to use deadly or other excessive force. . . . If the victim uses such force, the aggressor's right of self-defense arises. . . .'"].) Rodriguez maintains the trial court had a duty to include a statement of this principle in CALCRIM No. 3471 because the "evidence did not clearly establish [he] had his gun out on display" before Frank attacked him with a bat and, thus, there was substantial evidence that, although Rodriguez was the "initial aggressor," it was Frank who first used the sudden, deadly force of the baseball bat.

Similarly, Rodriguez argues CALCRIM No. 3472, in the unmodified form given by the trial court, failed to include the principle that "a person who provokes a fight or quarrel with an intent to use nondeadly force regains the right to perfect or imperfect self-defense when his or her opponent counters with deadly force." (See *People v. Ramirez* (2015) 233 Cal.App.4th 940, 950 [trial court erred in giving CALCRIM No. 3472 without modification because the instruction "entirely precluded defendants' self-defense claim," regardless whether "the original victim escalated a nondeadly conflict to deadly proportions"].) He maintains the court had a sua sponte duty to modify the instruction to include this principle because, again, there was substantial evidence Rodriguez "provoked only a non-deadly confrontation," to which Frank responded with deadly force.

The trial court did not have the sua sponte duty to instruct as Rodriguez suggests. Substantial evidence did not support

14

modifying either instruction as proposed because there was no evidence that, at any time, Rodriguez used or had an intent to use "nondeadly force." Certainly there was evidence he used and intended to use the deadly force of the pistol (see *Salazar*, *supra*, 63 Cal.4th at p. 249 [sudden escalation instruction does not apply where original assailant "'makes a felonious assault upon another[ ] or has created appearances justifying the other to launch a deadly counterattack in self-defense'" (italics omitted)]; *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201 [same]), and arguably there was evidence he used and intended to use *no force at all* until Frank hit him with the bat. But there was no evidence that, before Frank hit him with the bat, Rodriguez committed or intended to provoke, for example, a nondeadly "simple assault." (*Salazar*, at p. 249; see *id.* at pp. 249-250 [defendant was not entitled to sudden escalation instruction on self-defense because "the evidence did not support a finding that defendant was guilty only of simple assault when he initiated the confrontation by approaching the victim with a cocked gun"].)

Moreover, not only did Rodriguez not rely on a defense that he initiated a fight using or intending to use mere nondeadly force, such a defense was inconsistent with his theory of the case, which was that Frank started a deadly fight out of the blue. Counsel for Rodriguez argued strenuously that Rodriguez and Estrellas did not threaten anyone, that they approached Miguel and Basurto merely to express an interest in the graffiti on the garage wall—"they even shook their hands, introduced themselves"—and that Frank came down to the garage and "started this," "saying F these guys and, bam, starts going against [Rodriguez] and beating him, beating him until he is

15

pulling out a gun, and he randomly shoots."[7] To apply the instructions Rodriguez argues the trial court erroneously failed to give, the jury would have had to find true a fact Rodriguez vehemently denied, namely, that he started the fight. (See *People v. Jo* (2017) 15 Cal.App.5th 1128, 1168-1169 [instruction was inconsistent with the defendant's theory of the case because it "required [her] to acknowledge, if only inferentially, the existence of facts which she otherwise denied"]; *People v. Meneses* (2008) 165 Cal.App.4th 1648, 1665 [mistake of fact instruction was inconsistent with the defendant's theory of the case where he "claimed he did not know the source of [allegedly stolen police reports], not that he thought his source was legal"].)

### 2. *Rodriguez Has Not Demonstrated His Trial Counsel Provided Ineffective Assistance*

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms.

---

[7] As counsel for Rodriguez summarized the evidence in his closing argument: "Frank wasn't terrorized. He's a little hothead. That's why he's got the little hornet [tattoo]. These guys [i.e., Rodriguez and Estrellas] came into the hornet's nest. That's what happened that day. . . . They're walking down and see graffiti and walked up. People walk up on strangers' garages all the time. Hey, I mean, that wall is kind of unique. . . . We have a spray can. You mind if we spray? And here comes Frank, already mad . . . . He came down here, and he's drinking. . . . And he sees these two strangers in his garage. Who the heck are you? . . . And he's getting riled that these guys are here. And they paint the picture that it was so tense in there. Wasn't tense. They're still drinking beer."

16

Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.'" (*People v. Hoyt* (2020) 8 Cal.5th 892, 958.) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) On direct appeal, "a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*Id.* at p. 1009.)

Rodriguez does not contend that the record affirmatively discloses his trial counsel had no rational tactical purpose for not requesting the instructional modifications or that his counsel failed to provide a reason when asked. He contends there can be no satisfactory explanation for it. But there are. First, counsel may have recognized that, as discussed, the proposed instructions did not apply because there was no evidence Rodriguez, at any point, used or intended to use nondeadly force. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1052 [counsel did not provide ineffective assistance by not requesting an instruction that was not supported by substantial evidence].) Second, counsel may not have wanted instructions that, as also discussed, conflicted with Rodriguez's theory of the case. (See *People v. Carrasco* (2014) 59 Cal.4th 924, 990 ["counsel may not have wanted an . . . instruction out of concern that it would distract the jury's

17

attention from the totality of the evidence that could create a reasonable doubt"].)  In particular, to rebut charges the murder and attempted murders were premediated and deliberate, trial counsel (like appellate counsel for Rodriguez, as we will discuss) may have considered it important to insist that Frank's deadly force attack with the bat was entirely spontaneous and therefore an utter surprise to Rodriguez, a factual scenario that conflicted with the omitted instructions.

Finally, because substantial evidence did not support the instructions counsel did not request, Rodriguez has not shown the requisite prejudice because "it is not reasonably probable that any such request would have resulted in the giving of such instructions by the superior court and in the returning of verdicts in accordance therewith by the jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 736.)  Rodriguez has failed to demonstrate his counsel rendered ineffective assistance.

B.    *Substantial Evidence Supported the Jury's Findings That the Murder and Attempted Murders Were Deliberate and Premeditated*

Rodriguez argues substantial evidence did not support the jury's findings that the murder and attempted murders were deliberate and premeditated.  Instead, he argues, "the evidence in this case showed [Rodriguez] fired his gun only in response to the sudden and spontaneous act of violence committed by Frank."

"'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable

18

trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court ""presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.""" (*People v. Morales* (2020) 10 Cal.5th 76, 88; see *People v. Penunuri* (2018) 5 Cal.5th 126, 142 ['"A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict."'].)

'"In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.""" (*People v. Jurado* (2006) 38 Cal.4th 72, 118; see *People v. Herrera* (1999) 70 Cal.App.4th 1456, 1463, fn. 8 ["[w]e do not distinguish between attempted murder and completed first degree murder for purposes of determining whether there is sufficient evidence of premeditation and deliberation"], disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199.) ""Premeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.""" (*People v. Solomon* (2010) 49 Cal.4th 792, 812; accord, *People v. Morales*, *supra*, 10 Cal.5th at p. 88.)

The Supreme Court in *People v. Anderson* (1968) 70 Cal.2d 15, 26-27 (*Anderson*) "identified three categories of evidence relevant to determining premeditation and deliberation:

19

(1) events before the murder that indicate planning; (2) a motive to kill; and (3) a manner of killing that reflects a preconceived design to kill.  As we have repeatedly pointed out, and now reaffirm, '[t]he *Anderson* guidelines are descriptive, not normative.  [Citation.]'  [Citation.]  They are not all required [citation], nor are they exclusive in describing the evidence that will support a finding of premeditation and deliberation."  (*People v. Gonzalez* (2012) 54 Cal.4th 643, 663.)

Ample evidence supported the jury's findings the murder and attempted murders Rodriguez committed were deliberate and premeditated.  After Frank hit him with the bat and had run away, Rodriguez shot at—individually, from close range, and pausing between each shot—Miguel, Cardenas, and Basurto, none of whom was armed or attacking him.  Indeed, he continued to shoot at Miguel as Miguel ran away from him, and he shot Basurto in the back of the head.  (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 421-422 [that victims in no "way provoked the shooting or struggled with defendant, whose demeanor at the time was described as 'cold,'" and that victims were "shot in the head or neck from within a few feet, a method of killing sufficiently "'particular and exacting,'" supported a finding of premeditation and deliberation]; *People v. Marks* (2003) 31 Cal.4th 197, 232 ["'focused'" manner of shooting supported finding of premeditation and deliberation]; *People v. Thomas* (1992) 2 Cal.4th 489, 519 ["'A senseless, random, but premeditated, killing supports a verdict of first degree murder.'"].)  The gang expert's testimony suggested Rodriguez's motive was to preserve his standing among fellow gang members by retaliating for Frank's attack.  (See *People v. Cole* (2004) 33 Cal.4th 1158, 1224 ["'some evidence of motive in conjunction

with . . . a deliberate manner of killing'" suffices to sustain a finding of premeditated and deliberate murder].)

But even before Frank attacked Rodriguez with the bat, there was substantial evidence of deliberation and premeditation for all the murder and attempted murder counts. Bringing a loaded pistol to the garage was strong evidence of planning, "the most important of the *Anderson* factors." (*People v. Edwards* (1991) 54 Cal.3d 787, 814; see *Salazar, supra*, 63 Cal.4th at p. 245 ["defendant brought a loaded gun with him to the [location of the crime], demonstrating preparation"]; *People v. Adcox* (1988) 47 Cal.3d 207, 240 [the "fact that defendant brought his loaded gun" to the scene of the shooting "and shortly thereafter used it to kill an unarmed victim reasonably suggests that defendant considered the possibility of murder in advance"]; *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224 ["As to prior planning activity, defendant was carrying a loaded gun with him at the time of the incident."]; *People v. Williams* (1995) 40 Cal.App.4th 446, 455 ["[p]lanning was evidenced by 'the fact that defendant brought his loaded gun [with him] and . . . thereafter used it to kill"].) Rodriguez also displayed the pistol in a threatening manner while he and Estrellas asked menacing questions about the victims' gang affiliations—questions for which, according to the gang expert, virtually any answer would lead to violence. Rodriguez even chambered a round in preparation for firing. (See *Salazar*, at p. 245 [defendant and his companion "both cocked their guns as they approached [the victim], strongly suggesting they were contemplating a shooting"].) And finally, the jury could reasonably credit Frank's testimony that he attacked with the bat only because he feared Rodriguez intended to shoot him and the other victims.

C.  *Rodriguez May Present His Ineffective Assistance of Counsel Claim Concerning the* Franklin *Proceeding in a Petition for Writ of Habeas Corpus*

1.  *Relevant Proceedings*

At a posttrial hearing in September 2018, attorney Ryan Kinderman stood in for Rodriguez's trial counsel, Alex Kessel. During that hearing the court and parties discussed, in the court's words, "*Franklin*-type information," which the court stated "we need to deal with at the time of sentencing or some time either shortly thereafter or shortly before that event." Kinderman stated that, to the best of his knowledge, Kessel was "aware of it and working on it" and "in the process of getting things together."

In October 2018 Kessel filed a two-page memorandum titled "Defendant's Sentencing Factors in Mitigation," which began: "Defendant Wilfredo Rodriguez submits the following *Franklin* factors for the court's consideration . . . ." The memorandum represented Rodriguez was 20 years old at the time of the crime and listed a number of circumstances supposedly indicating "[t]here was no real evidence of premeditation and deliberation."[8] The memorandum stated that Rodriguez had "no prior adult criminal record" and "was sent to Juvenile Camp as a minor"; that he had "a supportive family, mother, father and brother"; that he "was employed at the time of his arrest"; that he "never intended to kill anyone"; and that a

---

8       In the list was an incorrect assertion that Rodriguez's "only real possible liability for murder was based on the natural and probable consequence theory (assault as target crime)."

"60 to life sentence for defendant is the equivalent to a life without parole sentence."

At the sentencing hearing in June 2019, the trial court and Kessel had the following exchange:

"Mr. Kessel:  I just want to make sure that the record—I had also filed a Defendant's Sentencing Factors in Mitigation.  I would just ask Your Honor, regardless of what the court does, that that be attached to the probation report as part of the record that goes to the prison because I believe the defendant may and will at some point be eligible for the California youth act[9] that has certain prerequisites and ask that the factors—whether the court finds them to be true or not—at least it be attached to the probation report, Your Honor.

"The Court:  So we're kind of talking a bit about the *Franklin* issues.  Are there any other—is there any other documentation that you are going to be presenting at this time?

"Mr. Kessel:  No, Your Honor.  I am not so much talking about *Franklin* for the court to make different decisions.  Obviously, we wanted the court to consider reducing, and the court has that power under the new trial statute, but it's more for sentencing now obviously.  And also in the future, as you know, there's many laws, including the California youth act, whether he's applicable [*sic*] or not, and whether at some point he can avail himself of the benefits of that, he is eligible for it.  I just wanted the mitigation factors to be part of the record, Your Honor.

---

9    It is not clear what Kessel was referring to by "the California youth act."

23

"The Court: Right. And I don't see any issue with that. But my question is, he is eligible under [section] 3051? He was under 25 years of age at the commission.

"Mr. Kessel: Correct.

"The Court: At some point he will be entitled to a hearing, and the *Franklin* issues are that the defendant presents to the court—not for the court's ruling, but for inclusion in his prison file things that would assist a parole board at a future date to understand what Mr. Rodriguez's situation is today or at the time of the commission. And that's what I am referring to.

"Mr. Kessel: That's some of the things that I referenced in my factors in mitigation, which I labeled also as *Franklin* factors, Your Honor.

"The Court: Very well. That is what you are submitting to the *Franklin* factors as well?

"Mr. Kessel: That's what I have submitted, yes, sir.

"The Court: Very well."


2.      *Applicable Law*

"To bring juvenile sentencing in California into conformity with [then-recent decisions by the United States Supreme Court construing the Eighth Amendment's prohibition on cruel and unusual punishment], the Legislature enacted Senate Bill No. 260 (2013-2014 Reg. Sess.), effective January 1, 2014, adding sections 3051 and 4801, subdivision (c), to the Penal Code. These provisions require the Board of Parole Hearings (Board), with certain limited exceptions, to conduct a youth offender parole hearing no later than a juvenile offender's 25th year of incarceration . . . (Pen. Code, § 3051, subd. (b)) and, when considering parole eligibility for these youth offenders, to 'give

24

great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity' (Pen. Code, § 4801, subd. (c))." (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 298.) "The Legislature's intent in enacting sections 3051 and 4801 was "'to establish a parole eligibility mechanism that provides a person serving a sentence for crimes that he or she committed as a juvenile the opportunity to obtain release'" upon a showing of maturation and rehabilitation." (*In re Cook* (2019) 7 Cal.5th 439, 449.)

In *Franklin*, *supra*, 63 Cal.4th 261 the Supreme Court "authorized postjudgment proceedings to effectuate that intent," which are commonly referred to as a "*Franklin* hearing." (*In re Cook*, *supra*, 7 Cal.5th at p. 449; see *id.* at p 459.) "A *Franklin* proceeding gives 'an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to "give great weight to" youth-related factors [citation] in determining whether the offender is "fit to rejoin society" . . . .' [Citation.] At the proceeding, 'the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. [The defendant] may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors.'" (*In re Cook*, at pp. 449-450;

see *Franklin*, at pp. 283-284 ["[a]ssembling such statements . . . is typically a task more easily done at or near the time of the juvenile's offense rather than decades later"].)

### 3. *Analysis*

The People do not dispute that, under *Franklin, supra*, 63 Cal.4th 261, Rodriguez was entitled to an "opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin*, at p. 284; see § 3051 [any prisoner who was 25 years of age or younger at the time of the controlling offense receives a youth offender parole hearing].)  Rodriguez, for his part, concedes he had an "adequate opportunity" to do so.  He argues, however, we should remand to give him another opportunity because his trial counsel rendered ineffective assistance in connection with the proceeding.  Specifically, Rodriguez maintains the "cursory document" Kessel presented at sentencing "fell woefully short of presenting and preserving the type of evidence . . . that will be relevant to the parole board's evaluation of his future youth offender parole hearing."

We have concerns about Kessel's performance in the *Franklin* proceeding, including that he did not seem to understand the point of it.  (See *People v. Sepulveda, supra*, 47 Cal.App.5th at p. 300 ["The purpose of providing an opportunity to present youth-related factors mitigating culpability is not to influence the trial court's discretionary sentencing decisions but to preserve information relevant to the defendant's eventual youth offender parole hearing."].)  But on this record we cannot say he rendered ineffective assistance.  The record does not affirmatively disclose he had no rational tactical

26

purpose for his challenged conduct, nor does it reflect he was asked for a reason and failed to provide one. And there are conceivable satisfactory explanations. For example, it may be that, after exercising reasonable diligence, Kessel found no more favorable (or found more damaging) information than he submitted. Or he may have had concerns about possible rebuttal evidence from the prosecution. As the Supreme Court has recognized, "some offenders may choose not to present certain forms of evidence, such as live testimony, or to forgo a *Franklin* proceeding altogether. Delving into the past is not always beneficial to a defendant. The opportunity for a *Franklin* hearing is just that: an opportunity." (*In re Cook, supra*, 7 Cal.5th at p. 459]; see *Sepulveda*, at p. 302 [court on direct appeal could not resolve an ineffective assistance claim relating to *Franklin* proceeding where the record did "not explain why counsel chose to proceed in this fashion"].) Notably, Rodriguez does not specify what more Kessel should have done or submitted. And for that reason, Rodriguez has also failed to demonstrate any prejudice from the manner in which Kessel proceeded.

The Supreme Court in *In re Cook, supra*, 7 Cal.5th 439 stated that section 1203.01 provides "a plain, speedy, and adequate remedy at law that makes resort to habeas corpus unnecessary, at least in the first instance." (*In re Cook,* at p. 452.) This, however, is not the first instance for Rodriguez; he is seeking a second *Franklin* hearing because he claims his trial counsel provided ineffective assistance at the first one. In this situation, a petition for writ of habeas corpus is the appropriate vehicle for Rodriguez's claim. (See *People v. Sepulveda, supra*, 47 Cal.App.5th at p. 301.)

D.    *The Abstract of Judgment Must Be Corrected*

Rodriguez contends, the People concede, and we agree the abstract of judgment incorrectly reflects he was "sentenced pursuant to . . . PC 667(b)-(i) or PC 1170.12," i.e., the three strikes law (§§ 667, subds. (b)-(i), 1170.12).  We direct the trial court to correct that mistake on the abstract of judgment.

## DISPOSITION

The judgment is affirmed.  The trial court is directed to impose the minimum parole eligibility term of 15 years under section 186.22, subdivision (b)(5), and to correct the abstract of judgment so that it does not reflect Rodriguez was sentenced under the three strikes law.  The trial court is also directed to prepare a corrected abstract of judgment and forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

SEGAL, J.

We concur:

PERLUSS, P. J.                    FEUER, J.

28